[PHILADELPHIA, JANUARY, 31, 1831.]

## M'CALMONT *against* WHITAKER.

The water power to which a riparian owner is entitled, consists of the difference of level between the surface where the stream in its natural state first touches his land, and the surface where it leaves it. It may be occupied in whole, in part, or not at all, without endangering the right, or restricting the mode of its enjoyment, unless where there has been an actual adverse occupancy for a period commensurate with the statute of limitations.

A right by prior appropriation, has regard to the quantum of water drawn from a stream, common to both parties, and not to the quantum of fall.

An award of referees is to be set aside only for plain error in fact or law, and not for *suspicion* of error.

### EXCEPTIONS TO THE REPORT OF REFEREES.

THE plaintiff was the owner of a tract of land, mill and water power on *Taconey* Creek, and the defendant was the owner of a tract of land, mill and water power below the plaintiff's on the same creek.  The plaintiff complained of being injured by the erection of the defendant's dam, whereby the water was backed upon the plaintiff's land, and it was referred to referees under the Act of 1705, to decide whether the defendant's dam should be lowered, and to what extent, and what damage the plaintiff had sustained, if any, with power to award conditional damages to carry their award into effect.

The referees awarded as follows :—" We the referees in the above case, having heard the parties, their allegations and proofs, and having personally examined the dams, mills, water power, and premises, of the plaintiff and defendant mentioned and referred to in the rule of reference, do decide and award that the over-fall of the dam of the defendant across *Tacony* Creek, from *wingwall* to *wingwall* as it now is, shall be lowered nine inches and one fourth of an inch, and that the height thereof shall not in any part be less than two feet, six inches and three fourths of an inch below the centre of a mark made by us on the face of the rock on the westerly side of defendant's mill-pond, and that the minimum breadth of the overfall of the defendant's said dam, shall be the distance now between the said *wingwalls*, which is about one hundred and twenty-eight feet and six inches, which height and breadth we hereby fix as the proper height and minimum breadth of the overfall of the defendant's dam, and which height and breadth so fixed by us, shall be conclusive of the rights of the parties.   And in pursuance of the authority given to us, and to carry our award into effect, we do further award to the plaintiff the sum of five thousand dollars as conditional damages, to be paid to him by the defendant, and for which the plaintiff shall be at liberty to take out execution on the 31st day of *December*, 1830, unless the de-

(M'Calmont *v.* Whitaker.)

fendant shall on or before the said 31st day of *December*, 1830, reduce and lower his said dam, between the said *wingwalls*, to the height so as aforesaid fixed by us as the proper height thereof."

(Signed)    { *Seth Craig,*
             *Robert Toland,*
             *Charles Bird.*

The defendant filed the following exceptions to the award.

" 1. Because the referees have made their award upon the ground that the dam of the defendant was originally higher than he was entitled to make it, which was plainly against the evidence.

" 2. Because they have made their award upon the ground that the dam of the defendant was raised, after it was first erected, to a greater height than he was entitled to raise it, which was plainly against the evidence.

" 3. Because they have made their award upon the ground that the plaintiff after the erection of the defendant's dam has a right to sink or reduce his water-wheel, and that if by so doing the water was backed by the defendant's dam against the plaintiff's wheel, the defendant was bound in point of law to lower his dam.

" 4. Because they have made their award upon the ground, that the plaintiff after the erection of the defendant's dam, had a right to deepen his tail race, and that if by so doing the defendant's dam backed water into the tail race of the plaintiff, the defendant was bound in point of law to lower his dam.

" 5. That in other respects the said award is against the law and evidence."

The plaintiff offered evidence to the referees to prove, that his tail race had been used in the place where it then was for fifty years: That on levelling the same in 1822, the fall from the bottom of the old wheel to the bottom of the tail race at the mouth, was twenty-six inches and three fourths of an inch, and in 1825, the fall from the top of the sheathing under the old wheel was twenty-three inches: That a new wheel was afterwards put in on the same centre, which was lower at the bottom from twelve to thirteen inches and a half: That the tail race had been deepened accordingly from the mouth upward, but not at the mouth: That before the erection of the defendant's dam, to wit, in 1815, and when the plaintiff's mill was stopped, the tail race was always dry at the mouth except in time of freshets: That at the time of entering this action, and for several years before, the back water in the mouth of the tail race was from fifteen to eighteen inches deep, and stood seven inches upon the new wheel, when the defendant's dam was full; but when the water was drawn off by working the defendant's mill, which was frequently the case in dry times, and when the plaintiff's mill was stopped for want of water, the mouth of the tail race would become entirely bare.

The defendant offered evidence to the referees to prove that his dam, when it was first erected, did no injury to the plaintiff: That it had not since been raised: That the water only rose, when first built, to certain holes in the dye-house, left for venting the dye-liquor, and that it only rose to the same height now, by reason of the dam: That these holes have not since been changed: That the plaintiff had deepened the mouth of his tail-race and removed obstructions in the creek below the same, so as to alter the natural state of the stream, and increase his fall.

The facts here presented, are selected from a mass of testimony, and are presumed to be sufficient for understanding the exceptions and opinion of the court, and to shew the contradictory nature of the evidence submitted to the referees.

In support of the exceptions, the referees were examined, and gave evidence as follows:

*Charles Bird* testified, that the referees, as the most effectual mode of deciding the matter submitted to them, had the defendant's dam drawn off: That they then stopped it below, and had it filled to a certain point: That when the water flowed to the mouth of the tail race on *M'Calmont's* line, they stopped it from flowing in: That they went on the principle that *M'Calmont* had a right to use all the power on his land in his own way: That they did not consider that one neighbour had a right to throw the water over the line of another: That they did not consider so much the height of the dam when built, as at the time of the investigation: That they went upon the principle, that the dam raised the water nine inches and a quarter higher at *M'Calmont's* line, than if there were no dam there: That he, (the witness,) had no doubt there was water in the tail-race from deepening it, and that there was a deepening at the line of the tail-race after *Whitaker's* dam was built: That he was not satisfied that the creek was deepened below *M'Calmont's* line, and that if the plaintiff's tail-race had been in its natural state, still the defendant's dam would have backed the water in it.

*Seth Craig* stated, that *M'Calmont* had from twenty-one to twenty-seven inches fall in his tail-race: That he had taken out all his fall but about an inch: That by doing that, the water backed up on him considerably: That the referees lowered the water in the dam till it was level with the mouth of the race, and made a mark on the rock: That they then set the wheel in motion again, with all the power on it, and it raised the water in the tail-race five inches and better: That they then endeavoured to fill the pond of *Whitaker*, but did not get it filled: That when the water was level with the holes in the dye-house, it rose in the tail-race fourteen inches and better, from fourteen to fifteen inches: That deducting the water from the wheel left nine and a quarter inches of water in the tail-race: That on this, they made their award: That the dam, when originally erected, threw the water into the mouth of the tail-race: That of the three surveys,

(M'Calmont *v.* Whitaker.)

they took that of 1821, which was the lowest : That *M'Calmont* had, with that, clear vent for the water in the tail-race, when the dam was erected : That the mouth of the tail-race fills up every year : That at the time the referees made the experiment, when the tail-race was dry, the water in the creek was fifteen inches : That the bottom of the mouth of the tail-race, which is gravel, is not as deep as the bottom of the creek by twelve or fifteen inches ; and that he was satisfied that the tail-race was not deepened at the mouth.

*Robert Toland* testified, that the referees were of opinion, that the mouth of the tail-race had not been deepened at the line : That they believed Mr. *White*'s evidence, who said there was no deepening of the creek : That they felt no doubt that the tail-race was not deepened at the line : That that was not a question distinctly decided by the referees : That they did not give credit to the witnesses who stated, that the bed of the creek was deepened ; and that when they made the experiment, they were satisfied, that the whole creek was then flowing in its natural channel.

*T. Sergeant* and *Chauncey* for the defendant.—The facts of the case are clear. The defendant's dam has never been raised since its first erection in 1815. All the evidence concurs to establish this fact. It did not, when erected, throw the water over the plaintiff's line. The referees now think, it throws the water back nine miles. But this was not occasioned by the act of the defendant ; it could only arise from the deepening of the mouth of the race to that extent, and the defendant afterwards digging down his race, by which the back water was let in. One of the referees, Mr. *Bird*, thinks it clear it was deepened, and in this he is sustained by the evidence. Mr. *Craig* thinks it was not, but this opinion is irreconcileable with the fact, that the dam had not been raised. If it is clear, that the race was deepened after the dam was erected, and that thereby the water was thrown back, this result was produced by the act of the plaintiff himself, and he has no cause of complaint against the defendant. He had no right, as the referees suppose he had, to use this additional fall, after the defendant had erected his dam. The referees never examined the question, whether the plaintiff could deepen his race, after the dam was erected, and let in the water. They examined the premises, and judged principally from that examination, without adverting to the evidence of what had been done, or what the plaintiff had a right to do. The question turned upon the defendant's rights in 1808, and not upon the state of things, as they now exist, affected by the acts of the plaintiff. No changes were made by the defendant : all was done by the plaintiff, and even while the controversy was existing. Prior to 1808, the plaintiff's mill was a small one : a wheel sixteen feet in diameter was then put in, and the race improved. In 1815, the defendant erected his dam, after which the water passed off freely. No change took place till 1817, nor was any complaint made until 1822. Our position is, that

if the plaintiff had the fall in 1808, and did not then use it, he could not, after the defendant had erected his dam, avail himself of it, and compel the defendant to conform to his alterations.

It is simply a question of the right to the use of the water of a running stream, which depends on a peculiar principle derived from the nature of the thing used. The only foundation of title known to the law, for the enjoyment of light, air and water, is occupancy. 2 *Bl. Com.* 13. 18. 403. 3 *Kent's Com.* 358. *Hatch* v. *Dwight*, 17 *Mass. Rep.* 296. *Angel on Water Courses*, 39. 48. 69. *Appx.* 21. 74. 170. 4 *Co. Rep.* 87. In relation to the right in question, the defendant was the prior occupant. The plaintiff's was not an ancient mill. For such portion of the fall as the plaintiff occupied prior to the erection of the defendants's mill, he was the prior occupant. About that there is no dispute, and he has not been disturbed in the enjoyment of it. But of that which he sought to occupy after the erection of the defendant's mill, the defendant was the prior occupant. The right in flowing water, is the right to use it, and no more. It is susceptible of no other. The law seeks, as far as it can, to give in every thing a definite and exclusive possession; but some things defy this effort, and in reference to them, a different rule is, from necessity, adopted. Among these things are light, air, water, and animals *feræ naturæ*, which lie in common and are open to the first occupier, who has the right or exclusive title, by virtue of occupancy alone. If a man erects a habitation near his neighbour's tan yard, the air may be unpleasant, but he has no remedy. So, if he builds against a wall previously erected. The rule with respect to a running stream is, *aqua currit, et currere debet.* No one can stop it, or entirely divert it from its natural channel; but every man may use it for cattle, irrigation, mills, &c. provided he does not injure a prior occupant. Before the defendant's dam was erected, namely from 1808 to 1814, each party had a right to use the water of the creek for mill purposes. The plaintiff had a right to take his whole fall, by digging down his race, and if after this the defendant had erected a dam, and occasioned back water, he would have encroached upon the rights of a prior occupant. The defendant had a right, on the other hand, to erect a dam and throw the water to the plaintiff's line, paying the intermediate owners, as he did. This was no injury to the plaintiff. Their rights were equal. Each had the right to use the stream, observing the rule, *sic utere tuo ut alienum non lædas.* Where two rights are equal, occupancy determines and fixes the property. It is no answer to this argument, that the plaintiff's right on his ground, is taken away by the defendant's occupancy of his right on his ground. It is *damnum absque injuria.* If there be a pump in common, and the first occupant takes away the water and thus deprives another of the use of it, the latter may suffer a loss, but he is not injured. So here, whoever first exercised his right, and used the current, acquired the exclusive property in it; a property as sacred as that of any other description. The right acquired by

(M'Calmont *v.* Whitaker.)

possession of twenty-one years, has nothing to do with the present question. That right· originates in the invasion of the exclusive property of another. It begins by an acknowledged wrong. There are three modes of acquiring such a right ; by deed ; by twenty-one years' adverse possession, and by occupancy of what was before in common. On this subject the books are uniform. It is true the plaintiff has a right to all his fall ; but this is no more than a right to occupy it. But if he neglects to do so, and another occupies it, he cannot afterwards use it, to the detriment of the prior occupant.

*J. S. Smith* and *Broom* for plaintiff.—Unless a clear mistake of law or fact be satisfactorily proved, the court will not set aside an award. 2 *Yeates,* 513. 5 *Serg. & Rawle,* 52. 1 *Binn.* 59. 2 *Wash. C. C. R.* 58.

It does not appear that the referees are sensible of any mistake in law or fact, or are dissatisfied with their award.

In support of the first and second exceptions, the defendant's counsel assumes the fact, that when the defendant's dam was first erected, it was not of a greater height than he was entitled to raise it. This fact is not only not admitted, but the referees had occular proof to the contrary, for when they filled the dam to the height of the holes in the dye-house, at which the water stood when the dam was first erected, the back-water rose nearly fifteen inches in the plaintiff's tail-race, that is to say, it occupied all the fall which had been in that race, except about six inches. But whether the dam as originally constructed or subsequently raised, caused the injury complained of, is entirely immaterial, except as to damages, which were not allowed ; the true question being whether the dam caused the injury at the time of bringing the action. It would be vain to say that it cannot produce the effect, which is now obvious to our senses, because it did not do so fifteen years ago. It was enough for the referees to determine whether the dam caused the injury at the time of bringing the suit. They lowered the water in the defendant's dam, until it came to a level with the mouth of the tail-race, and if the dam had not been again stopped, the mouth of the tail-race would have remained free. But they closed it, and the water rose from fourteen to fifteen inches in height above the mouth.

The referees were of opinion that the tail-race had not been deepened at the mouth, and the rise of the water there, by closing the dam, was sufficient to support their award, independently of any inquiry into the origin and progress of the obstruction, before the time of bringing the suit. The first two exceptions must fail, as the referees did not make their award upon the ground stated, and if they did, there was evidence to support them, of which they were the judges.

As to the third exception, it is sufficient to remark, that the plaintiff may vary the use of the water within his lines according to his pleasure, so that he does not injure the rights of others. 3 *Kent's Com.*

(M'Calmont v. Whitaker.)

356. *Angel on Water Courses*, 67, 68, 69, and *Appendix*, 170. 4 *Mason*, 404.

He may make his wheel as large or as small as he chooses, no one having a common use of the fall, and this principle was assumed by the referees; but if by so doing, the water was backed against the plaintiff's wheel, then the question will arise whether the water be backed above the level of the defendant's water line; and the referees having decided that the wheel as lowered was within the plaintiff's fall and above that level, they consequently admitted his right so to lower it, and to be protected in the use of it.

The fourth exception depends on the same principle as the third, *to wit :* The plaintiff had a right to deepen his race within his lines, and if he has deepened it below the defendant's water line, he must bear whatever injury he suffers to that extent; but if the defendant's dam cause water to flow in the plaintiff's race above the level of the defendant's water line, he must reduce to that extent. This principle was recognized by the referees, and by this court, 17 *Serg. & Rawle*, 373, and 1 *Rawle*, 218, are decided on the principle assumed that the owner of a mill below, has no right to back or swell the water beyond his line. The only use the defendant could make of the fact that his dam did not injure the plaintiff when erected, and has not been since raised, is the inference that the injury must have been caused by some act of the plaintiff. That was a question of fact to be decided by the referees, and they were satisfied by proof that the plaintiff had a fall in his tail-race which was obstructed by the defendant's dam, and they did not decide when or how it was done; and the defendant's counsel admit in their argument, that the plaintiff was entitled to the fall he had before the erection of the defendant's dam, undisturbed by it.

The opinion of the court was delivered by

GIBSON, C. J.—The water power to which a riparian owner is entitled, consists of the fall in the stream when in its natural state, as it passes through his land, or along the boundary of it, or in other words, it consists of the difference of level between the surface where the stream first touches his land, and the surface where it leaves it. This natural power is as much the subject of property as is the land itself, of which it is an accident; and it may, in the same way, be occupied in whole, or in part, or not at all, without endangering the right, or restricting the mode of its enjoyment, unless where there has been an actual adverse occupancy or enjoyment for a period commensurate with that required by the statute of limitations—a fact that is not pretended here; and as to a right by prior appropriation, that has regard to the quantum of water withdrawn from a stream common to both parties, and not to the quantum of fall. The latter can be augmented only by subtracting from the proprietor above, by swelling back on him; or by appropriating a part of the adjoining proprietor's fall below, by excavating the channel within

(M'Calmont v. Whitaker.)

his boundary, and carrying out the bottom on a level to some point in the inclined line of the natural descent; and it seems to me these were the principles, which guided the referees to the conclusion, at which they arrived.   Instead of attending to parol evidence of the original height of the defendant's dam, as well as of present confor- mity to its original height, and inquiring of the fact of present injury by the state of the fact as it stood originally, they had recourse at once to the best evidence of which the case was susceptible—the evidence of their own senses.   They proceeded to restore the creek to its natural state, by drawing off the defendant's dam till the mouth of the plaintiff's tail race, which is exactly where the creek issues from his boundary, was left dry; thus demonstrating with conclusive certainty, that for all the swelling above that point, the dam was an injury, provided the channel of the creek were not deepened for a considerable distance below the plaintiff's line.   But even if such deepening existed with the licence of the proprietors below, (and it seems there are intervening ones,) the power thus gained by the plaintiff would be as much the subject of protection from injury as the power afforded by the stream within his boundary.   But it seems the referees had regard to the right of the defendant, as far as the plaintiff's is concerned, as extending to the plaintiff's line; and we are to judge of the case in reference to the view they have taken of it.   Now an award such as this, is to be set aside only for plain and palpable error in matter of fact or of law, and not for suspicion of error. The error pointed out is said to have been in the assumption of a right for the plaintiff to set his wheel at any level he might think proper, and a correspondent duty on the part of the defendant to furnish fall for the water to pass off by the tail-race.   The referees deny this assumption, and the method by which they proceeded, shows that no such principle was adopted.  · Again, it is said, (and this is the only part of the case, about which it seems possible to raise a doubt,) that they did not inquire into the fact of deepening the channel of the creek, because they deemed it immaterial.   There was certainly satisfactory evidence of what is indeed admitted, a con- siderable deepening of the tail-race.   But this, it is evident, could have no effect on the result of the experiment to ascertain the all important fact of swelling the water in *the bed of the creek* at the plaintiff's boundary.   There was, however, evidence of stones or gravel having been taken from the creek, which the arbitrators say, they considered to be of little value; and I think it was rightly so considered, inasmuch as it was viewed in reference to a deepening im- mediately at the mouth of the tail race, and not an excavation carried along the bed of the creek into the land of the adjoining proprietor, so as to lower the level of the surface at the entrance of the tail-race. They say they did not consider an excavation there as a thing that would produce an alteration in the relative level of the surface, but as a hole in the bottom, which would be merely filled with dead water instead of gravel or sand.   But there was in fact no evidence

of such an excavation as would sink the surface of the water at the mouth of the tail-race. If such there had been, it would either have been filled up, or its existence manifested in the overfall consequent on drawing off the defendant's dam; nothing of which appears to have been discoverable. But the referees, who are the exclusive judges of the credibility of the witnesses, say they were not convinced of the existence of any improper deepening; and in this it seems to me, they judged accurately. In addition to the evidence of the channel itself, which showed no trace of such deepening, it seems pretty clear, that the plaintiff had from twenty-one to twenty-seven inches of fall in his tail race; and that having enlarged his wheel so as to sink the under part of it but thirteen inches and a half, it now stands from six to eight inches in back water. An ingenious manipulation of the testimony might perhaps involve the case in obscurity; but these are facts of which there is little doubt or perhaps dispute; and the conclusion from them is inevitable. There is, therefore, to be judgment on the award.

Huston, J.—The subject of the use of a flowing stream, and the nature and extent of the right to this use, are of much importance: may come into discussion under a great variety of circumstances, and may require very nice discrimination in the application of principles in the different cases which will occur. It is very common to assume a general principle, or principles, without a very extended view of the subject; without considering all the cases which then exist or may arise. The general principle thus assumed may be correct in the case under consideration, and not correct on a different state of facts and rights. Is it then a general principle? Although it is stated as one by the judge who delivers it, and has been repeated as such never so often, yet if a case not before thought of, occurs, if a person assuming that principle as universal, proceeds to act on it, in a way to produce undue advantage to himself, or injury to another, it is the duty of a court, to consider carefully, and if necessary, to modify or limit the extent of the principle.

It may be admitted that, generally, a man has a right to use all the fall in a stream of water, from the place where it enters his land to the spot where it leaves it: nay more, that if at the first erection of his machinery he did not use it all, he may change his site within his land, or raise his dam to flow it back to his line, or deepen his tail-race as low as he can, so as to deliver the water into its *natural* channel at his lower line. But he cannot raise his dam so as to throw the water back on the man above him; nor can he dig his tail-race through the land of the owner below, so as to deliver the water into its natural channel at a point where that channel is lower than at his own line; nor can he go into the channel of the creek in the farm below, and deepen that channel so as to make the bottom of the creek lower at his own lower line, than it was in a state of nature. He has no better right to blow rocks, or dig out gravel, or

(M'Calmont *v.* Whitaker.)

clay, in the channel of a creek below his own line, than he has to go into the fields below and dig a race: in either case he commits a trespass on the man owning below.   If he could do either, he could take from the owner below all that person's fall and add it to the tract above.   In the case before us, the person below had all the rights which have been stated, as fully as the plaintiff had: to the lower line of *M'Calmont* he could dam back the water, and no farther; but his right existed, as the creek, both at the bottom and top line of the water, was in a state of nature.

Every man who has seen a stream of water, knows that its bottom is not a regular inclined plane. If it were, the depth and the current would be equal; it is often very far from it; for many yards we find it almost a stagnant pool, and several feet deep; immediately below this we find a ledge of rock or of slate, or of hard pan, over which the water flows only a few inches in depth, and flows rapidly, and exhibits a ripple of more or less length, or a succession of ripples.   Now if you dig away the hard pan or gravel, or blow out the rocks the whole length of these ripples, to the depth of a foot or two, you change the pool above, and its surface is sunk a foot or two.   Suppose the line of the tract above crossed the creek over this pool; by taking down the bottom of the creek below, the owner of the land above *can* then lower the surface of the water on the tract above—*can* do so?   But can he do it legally?   Certainly he cannot.

Suppose in a state of nature there was four feet fall in the space of one hundred yards in the land below; if *M'Calmont* could dig out all this fall, so as to make it level for the whole of the hundred yards, he would have four feet fall at his own lower line, and by sinking his tail-race up to his wheel, could sink his wheel four feet, and make four feet addition to his head; but if the man below cannot dam back on this new wheel, he has taken four feet of water power from the man below, and that he has no right to do.   The principle then is, that he may use all the fall from his own upper to his own lower line, but he cannot add to that by sinking the bed of the creek on the land below: and this last limitation is as essential and important to *M'Calmont* the plaintiff, as to the defendant; for if the plaintiff can do this, the man above him may do the same thing.   *Rowland* could then sink the bottom of the creek on *M'Calmont's* land and on his own land above, and lower his wheel, so as that *M'Calmont's* present dam will throw back water on his wheel, and then sue him; and the principle adopted by these referees will lower *M'Calmont's* own dam, and so it may proceed from dam to dam to the head of the stream.

The rule must be, that a man has a right to dam back the water to his own upper line, as the water was, and as the bottom of the creek was in a state of nature, when he built his dam; and the man above, although it is possible to sink the bottom of the creek so as to make the dead water to extend, and the back water to stand over and on to his own land, he does not and he cannot make the man below a trespasser by so doing.

(M'Calmont *v.* Whitaker.)

It seems to me then, there was an essential error in law in the principle as applied to the case before the arbitrators. The important inquiry, perhaps the sole inquiry, or rather inquiries were, did *Whitaker*'s dam when originally built, dam the water at all on the plaintiff's land? If it did not, has it been raised since? The arbitrators say, they were disposed to disbelieve the witnesses as to deepening the bed of the creek, but were of the opinion that the dam of *Whitaker* had not been raised since its first erection; but they all thought it immaterial whether the bed of the creek at and below the plaintiff's line, had or had not been deepened. It does not appear to have occurred to them, that by the sole act of deepening the bed of the creek below, and then sinking his own tail-race, *M'Calmont* can set his wheel as low as the foundation of *Whitaker*'s dam; in other words, take away the whole of *Whitaker*'s water power. I assume it, that *Whitaker* had become the owner of the water power all the way up to *M'Calmont*'s line. That *Whitaker*'s dam has never been raised, is proved in so many ways, and so certainly, that it cannot be doubted. That it did not at first occasion the water to overflow *M'Calmont*'s land is proved; I may say, admitted; the plaintiff's own witnesses all say so. There is contradictory evidence as to blowing out rocks at the mouth of the tail-race, and in the bed of the creek below, and the referees, or some of them, say they rather believed those called by the plaintiff. There are, however, cases in which a matter is proved incontestibly by the nature of things. If *Whitaker*'s dam did not throw any back water on the plaintiff's land when it was built, and has never been raised, it would not throw any back water on it now, unless the plaintiff had lowered the bottom of the creek, and of his tail-race, unless there is some late discovery about the level of water, which I have not learned.

I consider this, then, a case of plain and palpable mistake of both fact and law, and would have set aside the report. I would have set it aside if there were reason to suspect that the matter had not been viewed in the true light. The plaintiff will allege this settles the rights of the parties finally; I would then be certain they were settled rightly. There is no good reason why a report of three men should have more sanctity than a verdict of twelve instructed by a judge. The law makes them equal: I would not give any preference to the report.

Judgment on the award.