## C. K. RHODES v. THOMAS WHITEHEAD AND OTHERS.

Generally speaking every riparian proprietor is entitled to the land to the middle of the stream. As the owner of the land, he has *prima facie* the right to the use of the water flowing over it, in its natural current without diminution or obstruction.

He has this right, however, only in common with every other proprietor; but none of them has a property in the water itself; each of them may simply use it while it passes along; there is, with reference to it, a perfect equality of rights among all the proprietors; it is a thing common to all; the consequence is, that no one of them can use it to the prejudice of another.

The water power, to which the riparian owner is entitled, consists in the fall of the stream when in its natural state, as it passes through his land, or along the boundary of it; or in other words, it consists in the difference of the level between the surface where the stream first touches his land and the surface where it leaves his land.

*Aqua currit et debet currere ut currere solebat* is a maxim no less of the civil than of the common law.

The appropriation of water for natural uses, such as for the use of people and cattle, and for household purposes, which must be absolutely supplied, can afford no ground of complaint by the lower proprietors, even if it were entirely consumed.

The momentum of the stream may be resorted to as a power for making it available, or it may be turned by a proprietor on his own land by a dam, or any other means which he may find appropriate for the purpose; yet, unless he has acquired the right of doing so by grant, licence, or such adverse possession as will give him the right by prescription, he cannot do it in a manner that will unreasonably detain the water, not consumed, from the riparian owners below, or throw it back beyond the line where it passes from the land of the owners above him.

Every injury to a water course, as by improperly diverting it, and every injury by means of a water course, by throwing the water back upon the land of another above, is a species of tort, denominated a nuisance, for which a party is entitled to redress by an action, in which he may recover damages, or may have such nuisance abated.

This suit was instituted by a riparian owner to abate as a nuisance a dam, erected by the defendants across the San Antonio river, within the limits of the city of San Antonio. The defendants pleaded that they and those under whom they claimed had the right from the authorities of the former government to erect the dam for the purpose of irrigation, and had asserted and exercised this right for more than one hundred years. The court charged the jury in effect to find a verdict for the defendants, if those under

whom the defendants claimed had acquired by grant, or prescription, an incorporeal hereditament, or servitude upon the land of the plaintiff previous to its grant by the government to those under whom he claimed; unless the plaintiff or those under whom he claimed had barred such right by acts of adverse possession, or by a denial for more than ten years, that his land was subject to the rights claimed by the defendants. It was *held*, that the rule laid down by the court to guide the jury in determining whether the servitude claimed by the defendants, if acquired by prescription, had been lost, was erroneous, but perhaps it might be sustained with reference to such rights, when created by express written deeds or grants.

A title by prescription is a mere presumption made by the law upon a given state of facts in furtherance of public policy, or to accomplish the ends of justice. It does not depend upon the actual belief of the fact presumed for its support.

He who invokes the aid of the court to sustain such title must show a concurrence in his favor of all the facts necessary to constitute the title by prescription, or authorize the court to presume the fact which it was incumbent upon him to establish.

One of the essential ingredients of a valid prescription is that it must have a continued and peaceable usage and enjoyment. This is wanting if there be a neglect to claim or enjoy it.

See this case for testimony, embraced in the opinion, which was held sufficient to raise the presumption *juris et de jure* of the right to the servitude claimed by the defendants as riparian owners; but not sufficient to satisfy the mind as a conclusion of fact that there was an express grant of the servitude by the government to the original grantees.

See this case for a discussion of the principles governing the acquisition and loss of servitudes.

In the above stated case, if the defendants had not the right, as against the plaintiff, to obstruct the usual flow of the river and thereby cause the water to overflow the plaintiff's lot, the dam erected by them, which occasioned this result, was a nuisance and the plaintiff was entitled to his action.

But if this right by prescription to overflow his land to the extent to which they had done, was not lost or abandoned at the time they built their dam, the plaintiff cannot complain for simply raising thereby the water upon his lot, or the deprivation of that part of it which had by this means become valueless; otherwise, if this right had been lost or abandoned.

The right to a nuisance cannot be acquired by prescription. If the damming of the water, though in accordance with a prescriptive right, "worketh hurt, inconvenience or damage," to the plaintiff by creating pools of stagnant or putrid water, or in any manner creating or causing such annoyance as seriously to interfere with the comfortable enjoyment of his property, or that it has a direct or decided tendency to cause sickness in his family or immediate neighborhood, it is a nuisance of which he may complain.

20*

ERROR from Bexar. Tried below before the Hon. Thomas J. Devine.

This action was instituted in the District Court of Bexar county on the 30th day of August, 1858, by the plaintiff in error against Thomas Whitehead and others for damages caused by the erection of a dam across the San Antonio river, and to abate the same as a nuisance.

The petitioner alleged that he was the owner of two lots of land situated within the limits of the city of San Antonio, which were bounded on the east and south by the San Antonio river; that he had constantly possessed and claimed the lots as the absolute owner for more than twenty years before the trespasses complained of were committed. That the defendants on the 1st day of May, 1858, erected a dam across said river, by which the water was raised over three feet and overflowed the lots of petitioner; by means whereof much of the trees, vegetables and garden of petitioner were destroyed and the value of said lots was deteriorated; that said dam caused stagnant pools of water upon the lots of petitioner, which produced sickness in his family. That said dam was erected across the San Antonio river near the center of said city and caused the water of the river to overflow the premises of a large number of the inhabitants of said city, and especially to overflow the springs, streets and alleys used in common by the inhabitants of the said city, of whom the petitioner was one; which said springs, streets and alleys, had been so used without interruption by the inhabitants in common for more than twenty years, and also endangered the health, life and property of a large number of the inhabitants of said city by reason of the increased danger of inundation from high freshets, and also by accumulating in the center and midst of the city stagnant pools of putrid water, of which inhabitants so endangered the petitioner was one; wherefore he alleged that said dam was a public and private nuisance; and worked the petitioner an injury, and prayed that it be abated.

The defendants denied the right of the plaintiff to recover damages, and asserted that they and those under whom they claimed had the right from the authorities of the former government to erect a dam in the place where the dam in question was constructed,

for the purpose of irrigating the lands of the mission Conception; that this right had been confirmed by the State of Texas, and carried into effect by the action of the authorities of the city of San Antonio. The defendants also asserted that they and those under whom they claimed have asserted and exercised this right for more than one hundred years. The defendants denied that the dam erected by them was either a public or private nuisance.

The facts introduced in evidence under these pleadings, and the charge of the court below, are sufficiently disclosed in the opinion of the court.

The jury found a verdict for the defendants; judgment was rendered accordingly; motion for new trial was overruled and the plaintiff prosecuted his writ of error.

*I. A. & G. W. Paschal*, for plaintiff in error.—1. The court below totally mistook the law in submitting the question of nuisance *vel non* to the jury.

The facts charged in the petition constituted a full charge of a public nuisance very injurious to the plaintiff. It was, therefore, a question of law for the court, and not of fact for the jury. (Smith v. McDonald, 11 Missouri Rep., 243.)

And as to what constitutes a nuisance, and the great principles which control this case, we refer to our printed argument in the case of Burditt & Case v. Swenson, 17 Tex., 489, and to the learned opinion of the present chief justice in that case.

And as to a nuisance growing out of the overflow of water courses, see Hays v. Chousard, 17 Tex. R., 589.

The great principle which seems to control all the modern cases is, that men must so use their own as not to injure the rights of others, or to incommode others; they must not endanger health or comfort, or produce inconvenience, and there can be no prescriptive right in a nuisance. (Howard v. Lee, 3 Sanford, 281; Brady v. Weeks, 3 Barber, N. Y. cases, 151.)

These cases at once overset the disputes among the learned doctors upon the subject of malaria, which doubtless had much control with the jury.

2. But the court assumed the extraordinary position that the

overflow was no nuisance, provided somebody else had had the right to the incorporeal hereditament aforetime; and this, notwithstanding that right had been abandoned for nearly thirty years, was allowing a prescription to a nuisance; it was reviving the imaginary grant of an incorporeal hereditament, and it was allowing a private right to injure the public interest under a changed state of civilization. A more erroneous view of law and human rights cannot be imagined.

The right to use a water course must always be subordinate to the principle that it shall not be so used as to damage others.

The use of water courses is, itself, an incorporeal hereditament, and no grant of the privilege by the government can enable any one to use the water to the detriment of the private rights of others, without making compensation to the owners. (Angell on Water Courses, § 7—115, 187; chap. 2, p. 49; § 4, p. 57, and cases there cited.)

(Cooper v. Barber, 3 Taunton, 99; Lawrence's Opinion, 110; Wall v. Nixon, 3 Smith's Reports, 316.) The interest in the river is common, and cannot be severed. (Vanderburgh v. Van Bergen, 13 John, 212.)

*S. G. Newton*, for defendants in error.—In this case, defendants suggest that there is no error in the record, and that the judgment is sustained by the evidence.

It seems to me that the issues were fairly presented by the court, particularly for plaintiff. The finding was upon the issues, and fully sustained by the evidence; and it is respectfully suggested that the judgment be sustained with costs. I refer to 3 Kent, 434 to 439, and 446 to 449, and cases cited; and 1 Texas R., 97; 4 Id., 45; 5 Id., 246; 8 Id., 416, in support of the verdict.

MOORE, J.—This is a suit by the plaintiff in error, Rhodes, to recover damages occasioned by a dam erected by the defendants across the San Antonio river, and to abate the same as a nuisance. The jury were instructed by the court that if the defendants, or those under whom they claimed, had received authority, from those

authorized by the former government, previous to the grant of the land claimed by the plaintiff, to erect near the site of the present one a dam of equal height with that constructed by the defendants, the plaintiff could only recover by showing that the land submerged by the present dam had been claimed by himself, or those under whom he derives his title, free from any right of the defendants, or those under whom they claim title, to submerge said land; and that this right on the part of the plaintiff, or his vendors, had been claimed and exercised for ten years before the erection of the present dam. And, also, that the breaking down of the former dam, and the consequent receding of the river, and laying bare a strip of land along the margin of the stream, gave no right to the plaintiff, or his vendors, to use this strip of land free from the right of the defendants to raise the river by the reconstruction of the dam. But to give the plaintiff the legal right to use this strip of land adversely to the right of the defendants, his claim to use or enjoy it in that manner must have been made openly for the term of ten years, or it must have been evidenced by such a possession or construction of improvements upon the whole or a part of it, for ten years, as would evidence an intention of permanent occupation adverse to the right claimed by the defendants to raise the river.

Generally speaking, every riparian proprietor is entitled to the land to the middle of the stream, or, as it is commonly expressed, *usque ad filem aquæ.* As the owner of the land, he has, *prima facie,* the right to the use of the water flowing over it, in its natural current, without diminution or obstruction. He has this right, however, only in common with every other proprietor. But none of them have a property in the water itself, for, like the air, it cannot be appropriated as the exclusive property of any one; but each of them may simply use it while it passes along. There is, with reference to it, a perfect equality of right among all the proprietors. It is a thing common to all, the consequence of which is, that one of them cannot use it to the prejudice of another. (Tyler v. Wilkerson, 4 Mason, C. C. Reps., 400.) "The water power," it has been said, "to which the riparian owner is entitled, consists in the fall of the stream, when in its natural state, as it passes

through his land, or along the boundary of it; or, in other words, it consists in the difference of level between the surface where the stream first touches his land, and the surface where it leaves it. (McCalmont v. Whitaker, 3 Rawle, 84.)

*Aqua currit et debet currere ut currere solebat,* is a maxim no less of the civil than the common law. (1 Kauf., Mack. Civil Law, 305, note *b.*) So, also, it is said, in the law of Scotland, in conformity with the civil law, that although a proprietor may use the water while within his own premises, he cannot alter its level, either where it enters, or where it leaves his property. (Bell's Law of Scot., 691.)

( It may be admitted that the purpose of irrigation is one of the natural uses, such as thirst of people and cattle, and household purposes, which must absolutely be supplied; the appropriation of the water for this purpose would, therefore, afford no ground of complaint by the lower proprietors, if it were entirely consumed. (Evans v. Merriweather, 3 Scam., 496.) And the momentum of the stream may be resorted to as a power for making it available, or it may be turned by a proprietor on his own land by a dam, or by any other means which he may find appropriate for the purpose. Yet, unless he has acquired the right of doing so by grant, license, or such adverse possession as will give him the right by prescription, he cannot do it in a manner that will unreasonably detain the water, not consumed, from the riparian owners below, or throw it back beyond the line where it passes from the land of the owner above him. For every party must exercise his own rights, and use his own property in such a manner as shall not cause detriment to that of another. (Hence, every injury to a water course, as by improperly diverting it, and every injury by means of a water course, by throwing the water back upon the land of another above, is repugnant to this principle, and is a species of tort denominated a nuisance, for which a party is entitled to redress by an action in which he shall recover damages, and that such nuisance shall be abated, or he may enter on the land of the other and abate it himself.

We have seen that the instructions given by the court required the jury, in effect, if those under whom the defendants claimed,

had acquired by grant or prescription an incorporeal hereditament
or servitude upon the land of the plaintiff previous to its grant
by the government, to find a verdict in favor of the defendants,
unless the plaintiff, or those under whom he claimed, had barred
such right by acts of adverse possession, or by denial for more
than ten years that his land was subject to the right claimed by
the defendants.    The instructions, it will be observed, place rights
of this character, whether acquired by express deed or grant, or as
an implied grant from secondary evidence, or from prescription by
reason of the length of time of their use or enjoyment, in the
same category.    The rule laid down by the court to guide the
jury in determining whether the servitude claimed by the defend-
ants, if acquired by prescription, had been lost, is obviously, if
not wholly unsupported by authority, contrary to the great weight
and number both of the adjudged cases and elementary authors.
(3 Campb., 514; Doe v. Hilder, 2 B. & Ald., 791; Wright v.
Freeman, 5 H. & John., 467; Hoffman v. Savage, 15 Mass., 130;
Drewitt v. Sheard, 7 C. & Payne, 465; Corning v. Gould, 16
Wend, 531; Dyer v. Dupui, 5 Whart., 584; Moore v. Rawson,
3 B. & Cress., 332; Taylor v. Hampton, 4 McCord, 96.)

The doctrine of the charge is perhaps sustained with refe-
rence to such rights, when created by express written deed or
grant.    (3 Kent, 448; 2 Evans' Poth., 136.)    And it has, also,
been said to be the rule of the latter Roman law, that rights ac-
quired by grant· are not lost by their non-exercise, unless the ser-
vient thing acquires its freedom from the servitude by prescription,
or a third party acquires the thing as a free property by prescrip-
tion.    Though the better opinion seems to be that, in respect to
servitudes such as the present one, they are governed by a different
rule.    (1 Kauf. Mack. Civil Law, 351, and note c.)

It is contended that on principle, servitudes, or incorporeal
hereditaments, whether proved by express grant or prescription,
should be regarded as of equal effect and validity.    The servitude
or easement upon the property of another is acquired by pre-
scription, because the length of time during which it has been
enjoyed becomes *presumptio juris et de jure* of an original
grant.    And that the grant thus conclusively established, must be

regarded as vesting as complete and perfect a right, as if the express grant of which it serves as evidence was itself before the court. The answer to this argument is, that a title by prescription is a mere presumption made by the law upon a given state of facts in furtherance of public policy, or to accomplish the ends of justice. The title by prescription does not depend upon the actual belief of the fact presumed for its support. Hence he who invokes the aid of the court to sustain such a title, must show a concurrence in his favor of all the facts necessary to constitute the title by prescription, or authorize the court to presume the fact which it was incumbent upon him to establish. One of the essential ingredients of a valid prescription, is, that it must have a continued and peaceable usage and enjoyment, and this is wanting if there is a neglect to claim or enjoy it. (3 Greenl. Cruise, Tit. 31, sec. 25, 40.) A party cannot complain, if the law will not indulge the presumption that he has a title which he has not asserted or exercised within the time necessary to bar a writ of entry, or that it will not call upon a party against whom an incorporeal hereditament is set up on evidence merely of facts that have long since transpired, to meet or repel them by contradictory proof, or by showing that it has been extinguished or abandoned. If a presumption is to be indulged from the enjoyment of a privilege, that it had a legal or rightful origin, it certainly may with equal propriety be inferred, when it is no longer used, that it has ceased to exist. And in many cases, this will be done where the servitude has been abandoned for a much shorter period of time than is necessary to acquire a right to it by prescription.

In illustration of the principle upon which this doctrine rests, I quote at some length from the able and philosophic treatise of Mr. Napier on Prescription, (p. 10, *et seq.*) "The possession," he says, "may be lost, and yet the right or affection to the property remain. But possession being lost, the property may be lost also by giving up that affection for the subject which constitutes the *animus dominandi,* and which is essential to the existence of a continued right of property. To dissolve therefore that legal tie, there must be consent as well as amission. That simple affection of the mind, by which a person wills that a thing previously his

property, should no longer remain so, without reference to any particular transference, constitutes what is called the *animus derelinquendi*, and that from which the mind has simply withdrawn affection, is termed *res derelicta*. Property in this predicament was considered to have fallen back into the natural state of *res nullius*, and consequently to be again susceptible of becoming the property of the occupant. Hence in the Roman law, which closely followed the law of nature, one of the legal causes for the acquisition of property, or for the entering possession *animo dominantis*, was the title *pro derelicto*.

" Actual dereliction, which is that of which we now speak, may either be expressly declared, or it may be left to be inferred from declaratory acts, *verbis, vel factis, vel non factis*.

" The will of the proprietor, when expressly declared, leaves no room for doubt; the doctrine of presumed dereliction, is more difficult. 'It is not easy,' says Lord Stair, 'to be known when possession is detained by the mind, and when relinquished, wherein there is a general rule that dereliction is not presumed, except it appears by evident declaratory acts or circumstances, as when it is thrown away in any public place where it cannot be taken up, or where another is suffered to possess without contradiction, or where possessory acts have been long abstained from, all which conjectures are in *arbitrio judicis*.'

" Upon universal principles of right reason, declaratory acts or circumstances may found not merely *presumtio juris* of dereliction, but *presumtio juris et de jure ;* so that if the true owner at length appears, and would explain away the presumption of dereliction, he cannot be heard; for the nature of human society requiring that certain matters should not remain *in dubio*, it is natural and necessary, that a reasonable presumption of the fact should stand for the actual fact. Hence the principle of natural law, that a presumption of dereliction, once established upon reasonable grounds, and in circumstances where doubt would be detrimental to the plan of human society, cannot be contradicted as untrue, or complained of as iniquitous.

" This doctrine of presumed dereliction is no legal fiction, therefore, contrived merely to cover the inequitable nature of prescrip-

tive property; but is itself a rule of natural law, proving prescription to be equitable as arising out of the necessity of giving a fixed and final interpretation to the conduct of men in regard to their rights, whenever that conduct can be rationally considered a tacit manifestation of their will.   In this manner, the natural connection between possession and property, combined with the doctrine of presumed dereliction, composes a positive rule of absolute property, equal to the right of the original occupation, or to a right by actual transfer *a vero domino.*"

If it was intended, however, in the court below to place this case upon the ground, that those under whom the defendant claim had acquired a servitude of flowing back the water of the river upon the plaintiff's land by an actual grant from the government, the evidence before the court did not warrant such an assumption. There was no pretence that any direct proof of such a grant could be adduced.   The fact of the existence of such an one is maintained as an inference from the grant of the land, claimed by the defendants, with the privilege of irrigation to the Mission of Conception, previous to the foundation of the Alamo church, the town of Fernandez, now city of San Antonio, or grant by the government to any one of the lands now owned by the plaintiff.   And that a dam of equal height with that erected by the defendants, was built near the site of the present dam by the fathers of Conception Mission for the purpose of irrigating their lands, before the existence of the grant under which the plaintiff holds his title. And that this dam and the Pogalachi or Conception ditch, dug by the fathers for the purpose of irrigating their lands, were referred to many years ago in ancient deeds and grants, as land marks or boundaries in the grants or conveyances of other lands.   That the ancient dam, though several times washed down by the floods in the river, had been from time to time prior to 1833, rebuilt by the fathers of the church, or those claiming the land under them. And that it had been used and enjoyed for the purposes and in the manner it is now used by the defendants for more than a hundred years prior to said date, without a denial of the right, or an adverse claim by any one. This testimony is unquestionably much more than sufficient to raise the presumption *juris et de jure* of

the right to the servitude thus long claimed and exercised. (1 White Recop., 140.) But does it satisfy the mind as a conclusion of fact, that there was an express grant by the government in favor of the Mission Conception, at the time of its foundation, of this servitude upon the adjoining unappropriated lands? It assuredly does not. To induce such a conclusion, it would have been necessary for those insisting upon it, to have shown that such grants were sanctioned either by the law or custom of the former government. Nothing of the kind was attempted. On the contrary, it is believed, while such a claim finds no support by express legal enactment, it is also entirely contrary to the usages and customs of former times in the distribution of lands, as well as contrary to the general principles by which the government was guided upon such subjects. (1 Moreau & Carlt., 337, 415.) The presumption of a grant, when made by courts from secondary evidence, is for the purpose of sustaining rights which must otherwise fail, and even then it cannot be done against law, or in violation of the settled usage and policy of the government. Shall then, in this instance, the presumption be indulged as a conclusion of fact, for the purpose of giving a more extensive right than is ordinarily and usually raised upon similar facts, and when such a presumption would be contrary to the usual inferences deducible from the facts?

The government in granting the lands attached to the Mission of Conception, gave to the grantees the right of a riparian proprietor, to use the water flowing over their land for all natural and artificial purposes to which it could be applied, consistently with the equal right of all other riparian owners, to make similar uses of it. In exercise of this right, those under whom the defendants claimed resorted to a means which to some extent created a servitude upon the adjoining land, and from the length of time they were permitted to enjoy it, the service became a matter of right as long as they should continue to use it. But whenever they abandoned or failed to use it, for such length of time as repelled the presumption of a right to its enjoyment, or to raise the presumption that such service had become derelict, it ceased to exist, and the plaintiff and those under whom he claimed held their land free

and independent of it. The charge of an incorporeal heredita-
ment or servitude by prescription upon land, does not work such
a change in the estate upon which it is charged, that the owner
cannot hold by his former right, except it is reacquired by matter
of record, or some act of his *in pais;* as in cases where the estate
itself has passed from him. If in such case the easement or servi-
tude charged upon the estate is lost or renounced, he holds by as
full and ample title as if it had never existed. And in cases of
continuous easement, or those of which the enjoyment is or may be
continued, without the necessity of any interference of man, the
presumption of their abandonment may arise from a period of time
much less than it will take to acquire them. (Best on Pres., 139–
40; Gale & What. on Easem., 16, 360, 362; Moore v. Rawson,
3 B. & C., 332.)

If defendants have not the right, as against the plaintiff, to ob-
struct the natural flow of the river, and cause the water to overflow
the plaintiff's lot, the dam erected by them, which occasions this
result, is a nuisance to the plaintiff, and he is entitled to his action
for the same. But if their right by prescription to overflow his
land, to the extent they have done so, was not lost or abandoned,
(of which however the evidence seems to leave no doubt,) at the
time they built their dam, the plaintiff cannot complain simply for
the raising thereby of the water upon his lot, or the deprivation of
that part of it which has by this means become valueless. The
right, however, to a nuisance, cannot be acquired by prescription,
and if the damming of the water, though in accordance with a pre-
scriptive right, "worketh hurt, inconvenience, or damage," to the
plaintiff, by "creating pools of stagnant and putrid water, or in
any manner creating or causing such annoyance as seriously to
interfere with the comfortable enjoyment of his property; or that
it has a direct or decided tendency to cause sickness in his family
or immediate neighborhood," it is a nuisance of which he may
complain.

But if such hurt, inconvenience or damage, is the result of the
wall built by the plaintiff obstructing the free flow of the water
over his land, or by the improper location of his house with refer-
ence to the stream, he has no right to complain. The defendant

cannot use his easement if he have one, so as to hurt or injure the plaintiff in the free enjoyment of that part of his lot not affected by it. At the same time the plaintiff must so use his property, if it can be reasonably done, that the defendants may not be hindered or obstructed in the lawful and proper use of their easement.

We are of opinion that the charge of the court was erroneous, and that the evidence did not sustain the verdict. The judgment is therefore reversed and the cause remanded.

Reversed and remanded.