## J. M. CAPE v. W. A. THOMPSON.

Decided November 1, 1899.

**Riparian Rights—Water Power—Diversion—Prescription.**

One who for more than ten years diverted the water of a stream to furnish power for his mill, returning it to the channel below the mill of a lower riparian proprietor, acquired by prescription a right to continue such diversion, though it had not prejudicially affected the power of the lower proprietor for the full period of prescription, the stream formerly furnishing sufficient power for both.

APPEAL from Hays. Tried below before Hon. H. TEICHMUELLER.

*W. M. Walton, S. B. McBride,* and *Brown & Pritchett,* for appellant.

*R. H. Ward, W. O. Hutchison,* and *Denman, Franklin, Cobbs & Mc-Gown,* for appellee.

COLLARD, ASSOCIATE JUSTICE.—This suit was brought in the District Court of Hays County, by appellant, John M. Cape, the 18th day of February, 1897, against W. A. Thompson, to abate the defendant's dam across the San Marcos River and the ditch cut by defendant to his mill from the river, and to require defendant to remove the same. The cause was tried on the 22d day of February, 1899, by the court without a jury, and judgment was rendered for defendant, from which this appeal is taken by plaintiff.

The trial judge filed conclusions of fact and law. The conclusions of fact are relied on by both parties. There is no statement of facts in the record. The conclusions of fact and law are as follows:

Conclusions of Fact.—"First.    That the San Marcos River, rising in and flowing through part of said Hays County, is a perpetually flowing stream of fresh water, derived from the San Marcos spring, situated about two miles above the site of plaintiff's hereinafter mentioned mill. And that from its mouth in Gonzales County, Texas, to a point more than one mile above plaintiff's mill and dam, it is of the average width of more than thirty feet.

"Second.    That on the 20th day of November, 1831, the then existing government of this country granted and conveyed to Juan Martin de Veramendi two leagues of land, both situated in what is now Hays County, one of which, commonly known and described as Veramendi league No. 1, lies upon the right or west bank of said river, and the other of which, commonly known and designated as the Veramendi league No. 2, lies upon the left or east bank of said river, which said two leagues of land were surveyed and so granted with separate measurements by the express declarations and statements in the grant, the grant reading in part as follows:    'I concede to, confer upon, and put the aforesaid citizen Juan Martin de Veramendi in real, actual, corporeal, and virtual possession of the said two leagues of land, on the heads of the San Marcos, which tracts having been surveyed by the scientific surveyor of this colony, citizen Byrd Lockhart, appointed for the purpose by me in the form prescribed by law, they resulted to be in the situation and with the boundaries following:   They are with separate measurements and situated on a stream made by the springs of water which form the heads of the San Marcos River; where the survey of No. 2 begins at a mound of stones which marks the northeast corner of No. 1, from which corner an elm of the diameter of ten inches stands south 39° E. at the distance of 14 varas; from which it runs N. 45° E. 5267 varas to the N. E. corner of the same survey, a stake being planted in the prairie, from which a mesquite tree of the diameter of twelve inches stands N. 75° W. at the distance of 145 varas; and from there, on a straight line, south 45° E. 3550 varas, which reaches the landmark placed for the S. E. corner, a few steps distant from the road of Bexar, following S. 45° W. 7700 varas to the aforesaid creek on its bluff, where a stake was planted, and from it at a distance of 3 varas there stands a post oak of the diameter of 30 inches N. 72° E., and another of the diameter of 14 inches that stands S. 80° W., at the distance of 6 varas, from whence with the turns of the aforesaid creeks upwards, until arriving in front of the lower corner of No. 1 there were measured 650 varas, and from there following always upward with the said turns to the head of the spring of water to a point marked with a set stake importing 6616 varas, from which stake there stands a box elder of the diameter of 10 inches S. 39° E. at the distance of 10 varas; from whence with the boundary of No. 1, N. 51° E. 60 varas to a set stake, from which there stands a post oak of the diameter of 20 inches, S. 26½° W. at the distance of ten varas, and another of the diameter of 10 inches which stands N. 10° E. at the distance of four varas, and from this (place) to the point where he commenced, following

with the boundary of the aforesaid No. 1, N. 150 varas, they complete the limits of this league, as is evidenced by the existing original field notes.

"'Continuing, return was made to run a line for the southwest boundary of the league No. 1, which is situated on the western side of the same creek formed by the said spring of water of those which form the heads of the San Marcos River, about two miles above the road of Bexar, at a point where another stake was planted, from which there stands a post oak of the diameter of 20 inches N. 45° E. at the distance of 2 varas, and an elm of the diameter of 10 inches, which stands N. 45° W. at the distance of 2 varas, continuing S. 45° W. 5870 varas to a mound of stones from which there stands a mesquite of the diameter of 8 inches, S. 7° E., at the distance of 180 varas, and from there on a straight line N. 45° W. three thousand nine hundred and twenty varas to the N. W. corner, from which stake there stands a post oak of the diameter of 12 inches, S. at the distance of 4 varas, and a cedar of the diameter of ten inches, which stands No. 30° W. at the distance of 4 varas, from whence run N. 45° E. 6163 varas to a stone monument from which there stands an elm of the diameter of ten inches N. 83° E. at the distance of 3½ varas, and another of the same diameter, which stands S. 14° W. at the distance of 4½ varas, and from there N. 60° E. 1740 varas which reaches the N. E. corner, from which corner mark there stands an elm of the diameter of 10 inches, S. 39° E. at the distance of 14 varas, and from there S. 150 varas to a planted stake, from which there stands a postoak of the diameter of 20 inches, S. 26½° W., at the distance of 10 varas, and another of the diameter of 10 inches which stands N. 10° E. at the distance of 4 varas, and from there to the spring of water of the San Marcos River, S. 51° W. 60 varas, where a stake was planted for this corner, and from which stake there stands a box elder tree of the diameter of 10 inches S. 39° E. at the distance of 10 varas, and from there to the point whence he commenced, following the turns of the creek downwards, these importing 6009 varas, they complete the limits of this other league, as appear from the field notes which exist originals.'

"Third. That the measurements and original field notes of said surveys so made by said Lockhart were as set forth in exhibit A and exhibit B, attached to and made parts of plaintiff's first amended original petition herein, but to avoid incumbering the record, said field notes are not copied into this finding, but as contained in said exhibits are referred to and made parts hereof.

"Fourth. That on the 12th day of August, 1896, the plaintiff was and yet is seized in fee and in actual possession of a tract of land, thirty acres, more or less, part of the said Veramendi league No. 1, composed of three minor tracts joining each other and constituting together said thirty-acre tract, and bordering upon the west bank of said river, it being the same land described in plaintiff's said petition as owned by him, and that plaintiff was so seized and possessed thereof on the 12th day of August, 1896, by mesne conveyances from and under the said Juan Martin

de Veramendi; that in the year 1866 the said land was owned in fee by one Wiley Bagley; that the said Wiley Bagley in the year 1866 constructed a dam across said river, extending from its west bank, where the said thirty-acre tract borders thereon, to its east bank, where the land of one William Thompson fronts thereon, just below and nearly opposite to the line between the land of said· William Thompson, who was the father of the defendant herein, and the land of H. W. Davis, next above, both the said Thompson tract and the said Davis tract being parts of the said Veramendi league No. 2, and both fronting upon said river on its eastern bank; but that shortly afterwards, upon objections being made by the said Thompson to joining said dam to his land, the said Bagley, with the verbal permission of said Davis, extended the dam a little further up the stream on the eastern side and joined it to the land of the said Davis. That in said year, 1866, said Bagley having thus dammed said river, established upon his said land at that point a mill with milling machinery and machinery for ginning cotton, and from thence forward employed and used the same in the business of grinding grain and ginning cotton for the public, receiving toll therefor, and by means of said dam, damming the waters of said river and applying them as a motive power for the propulsion of said machinery in thus grinding grain and ginning cotton. That prior to the year 1871 the said Wiley Bagley died, whereupon his children, Lindsey B. Bagley, Mirabeau L. Bagley, Volney H. Bagley, Leonora M. Bagley, Annie E. Bagley, Nancy A. Bagley, Rebecca M. Bagley, and Araminta L. Bagley, being thereby vested with the title to said land, the said H. W. Davis by deed in writing, of date March 24, 1871, granted and conveyed to them and their heirs and assigns the right to establish and attach to the said land of the said Davis on the east bank of said river a dam, to raise the water to any height they might see proper, provided it should not overflow any of the tillable land of the said Davis. That the said Davis land lying opposite to the said Bagley mill tract extended up the river until it joined a tract called the McGehee tract, which also bordered on the river.

"Fifth. That in the natural flow of said river, there was and is a difference of from nine to ten feet between the level of the water at the point where it passes the line between said Davis and McGehee tracts and the point at which said Bagley dam was constructed, and by reason whereof the said Bagley had and those claiming under him have a water power, and that he and those claiming under him might, by means of a dam at that point, have raised said water to the height of nine. or ten feet, and that too without overflowing any of the tillable land of the said Davis.

"Sixth. That when said Davis made said grant in writing to said Lindsey B. Bagley and the other grantees therein named, they owned the thirty-acre tract on which the said mill was, in fee, by mesne conveyances from and under Veramendi, and possessed in fee of the same by mesne conveyances from and under the said Lindsey B., Mirabeau L., Volney H., Leonora M., Annie E., Nancy A., Rebecca M., and Araminta

L. Bagley, and that plaintiff and those under whom he claims had on the 12th day of August, 1896, and owned and yet has and owns, by mesne conveyances, all the rights and appurtenances granted as aforesaid by said H. W. Davis to the said Lindsey B. Bagley and others named.

"Seventh. That for the purpose of utilizing and applying said water power, plaintiff and those whose estates he has and had in said land, have, ever since the year 1866, had and maintained and yet has and maintains a dam across said river at said point continuously and uninterruptedly, with said machinery and other appliances as are commonly employed for the application of water power to milling machinery and ginning machinery, and during all that period have had and maintained and yet has and maintains in position at said point machinery such as is commonly employed in grinding grain and ginning cotton; during all that period have raised the water of said river by means of said dam, applying the power thus controlled to the propulsion of such machinery; and during all that period have, by means of such power and machinery, been continuously and uninterruptedly engaged in and about the business of grinding grain and ginning cotton at that point for the public, receiving toll therefor, but never at any time raising the water to a greater height than nine to ten feet.

"Eighth. That in the year 1867, and for several years afterwards, one S. R. McKie owned a tract of land on said river next above and joining to plaintiff's said land, and extending from thence up the river, it being part of said Veramendi league No. 1, and being the same land described in defendant's original answer as owned by said McKie, and of which said McKie was then seized and possessed by mesne conveyances from and under the said Veramendi; that at the same time said H. W. Davis owned a tract of land bordering on the east bank of said river, and extending along said river from the aforesaid McGehee tract, to a point just a little below said Bagley dam, it being part of said Veramendi league No. 2, and being the land described in defendant's said answer as owned by said Davis and of which said Davis was thus seized and possessed by mesne conveyances, from and under said Veramendi. That at the same time, one William Thompson, the father of the defendant herein, owned a tract of land fronting on said river next to, below, and adjoining the said Davis tract, being part of said Veramendi league No. 2, the same land described in defendant's answer as then owned by William Thompson, and of which said Thompson was then seized and possessed by mesne conveyances from and under the said Veramendi, which said Thompson land extended along said river bank from said Davis land to a point below that at which was afterwards constructed the mill mentioned in defendant's answer as constructed by Thompson, Davis & Co.

"Ninth. That on the 1st day of June, 1867, said S. R. McKie, H. W. Davis, William Thompson, and the defendant W. A. Thompson, formed a partnership between themselves under the firm name of Thompson, Davis & Co., to carry on a mill business in said county, and about two miles below the head of said river, said partnership agreement being in

686 TEXAS CIVIL APPEALS REPORTS. [3d District,

writing and signed by the said parties. That to effect the purposes of said partnership, the said William Thompson at the same time conveyed to said firm two acres of his said tract of land, fronting about fifty yards on the bank of said river, and the right of way for said mill race twenty feet wide over his said land to the location of the said mill of said firm on said two-acre tract. At the same time, said McKie conveyed to said firm the right to join a mill dam to his land on the west bank of said river, and the said Davis conveyed to said firm the right of way through his said land on the east bank of said river for a mill race to be thirty feet wide on the point at which it enters upon his land to the point at which it leaves the old slough, and enters the bluff, and from that point to be twenty feet wide and to run to his lower line; all of said conveyances being in writing and duly executed and delivered. That said firm then built a dam across said river from the said Davis land to the said McKie land at a point about 400 yards above said Bagley dam, dug a race from said two-acre tract across the said Thompson land and Davis land, to the left or east bank of said river at a point just above the dam so built by said firm, and erected a saw mill on the said two-acre tract, granted to it by said William Thompson, with a view to running the mill by the water of said river brought through said race.

"Tenth. Before the water was turned from the river into the race, said Wiley Bagley and said McKie and Davis had a conversation about the water, in which Bagley protested against their diverting the water into their race, and in which the other parties, without conceding the right of Bagley to prevent them doing so, disclaimed any intention to injure him, and contended that such diversion of the water would not injure him, Bagley, but would leave ample water power to run both mills. Bagley consulted lawyers, and the result was his tacit acquiescence, ending all further controversy about it, and then said Thompson, Davis & Co., which was on or about June 1, 1867, tore down the east bank of said river, thereby turning water from the river into the race, conducting it through the race to their said mill, and using it as water power in running their milling machinery and ginning machinery.

"Eleventh. That no part of the water thus diverted from the river by said race has ever at any time been returned to the river anywhere above plaintiff's dam, but that it has always been returned to the river far below plaintiff's dam.

"That the defendant W. A. Thompson is the successor of said Thompson, Davis & Co., and has and owns all their rights of property in respect to their said two tracts of land, mill race, and dam; and that he and those under whom he claims have had open, peaceable, adverse, and uninterrupted and exclusive possession thereof, continuously, owning, using, operating, and enjoying the same ever since the water was thus first turned into the race, a period of more than twenty years next prior to the institution of this suit,—the possession, use, and occupation of said defendant above being for more than twenty years before filing of this suit.

"'Twelfth. That notwithstanding such diversion of water from the river by said race, thus begun in June, 1867, there was then and from thenceforth sufficient water left in the channel of the river, and flowing through that to the said mill of plaintiff and those under whom he claims, to run and operate the machinery of that mill at all times, until some time in the year 1892, and that neither plaintiff nor those under whom he claims ever at any time suffered any appreciable or material damages because of that diversion of the water until some time in the year 1892. That prior to the year 1892, and notwithstanding said diversion, the volume of water in said river was so great that there was at all times sufficient water reaching both mills in that way to run and operate the machinery of both.

"Thirteenth. That the capacity of said race has not been altered since it was constructed in 1867, and that it has carried from that time until the present, continually, about the same quantity of water.

"Fourteenth. That from some time in the year 1892, and from thence continually until the present, the volume of water flowing through the channel of said river from above the head of said race, and from thence below both of said mills, has been and yet is, from some unknown and unexplained cause or causes, materially less than it had been at any time prior to the year 1892, within the known history of that stream; that during the period beginning some time in the year 1892, and from thence continually until the present, the quantity of water reaching plaintiff's mill has been materially less than at any other time prior to 1892, and for this reason, at some time in the year 1892, those under whom plaintiff claims were then, and from year to year thereafter, especially during the ginning season, and until plaintiff acquired the property in 1896, compelled from time to time to suspend the operations of their said machinery for hours at a time, and until fresh accumulations of water should enable them to proceed; and the plaintiff, ever since he acquired said property has had the same experience in running and operating the same. That those under whom he claims by reason of this want of water sustained actual, material damages in the year 1892, and from time to time in every year thereafter, and that plaintiff, ever since he acquired the property, has from time to time sustained, for the same reasons, actual and material damage. That the water diverted through said race became in 1892, and has continued from thence until the present time, material and necessary to the running and operating of the machinery thus run and operated by plaintiff and those under whom he claims, and that but for such diversion of said water the aforesaid damages suffered by plaintiff and those under whom he claims in the year 1892 and ever since, if not wholly avoided, would have been and would be materially diminished.

"Fifteenth. That the defendant has long since quit running his saw mill. That he and plaintiff each runs a mill for grinding corn. That defendant runs three sixty-saw gins and that plaintiff runs three seventy-saw gins.

"Sixteenth. That there has been no material change in the height of either of the two dams before mentioned, since their construction.

"Seventeenth. That one-third of the volume of water of said river is diverted through defendant's said race and restored to said river below the mill and dam of plaintiff.

"Eighteenth. Plaintiff first purchased the property described in his petition in the year 1891 with full knowledge that defendant owned the dam claimed by defendant, and that he was diverting the water from the river through the mill race from said dam. Plaintiff thereafter sold said property and reacquired it in 1896. That there was plenty of water to operate both plaintiff's and defendant's machinery up to the time that the dam known as Green's dam was built across said river above the town of San Marcos, and about one and one-half miles above plaintiff's property. The water confined in said dam is used for propelling the machinery which supplies the San Marcos Water Company with water, which supplied the system of waterworks in the city of San Marcos, and operates the power of the electric light company which supplies said city with electric lights. The water is used by the electric light company at night, and the following morning, when they shut down, the water is then stored in said dam until the following night. Then during the ginning season that both plaintiff and defendant would become short of water in the afternoon of each day. But plaintiff could run his machinery longer than defendant. Defendant would have to stop and plaintiff could continue to run his machinery from one to two hours longer. This irregular use of the water by the electric light company would increase and decrease the flow of water in the San Marcos River from nine to ten inches, being from nine to ten inches deeper in the morning than it would be in the afternoon.

Conclusions of Law.—"First. The Act of 1837 defining navigable streams, being passed years after the grant of the land involved, had no retroactive effect, and did not impair the riparian rights of the grantees of the land and their purchasers.

"Second. There was no contract or agreement effected between the parties by the terms of which the defendants obligated themselves to restore the water whenever its diversion should prejudice plaintiffs.

"Third. Even if there had been such an agreement between the original parties, it is not shown that the present plaintiffs had any notice of it, but they purchased without any knowledge of such agreement, and with full knowledge of the existence of defendant's dam and race. Such private parol understanding between the original parties, if it had ever existed, did not pass any rights as incidents to the realty, to subsequent purchasers without notice of it.

"Fourth. Possession and use by defendant of his dam and mill race were adverse to plaintiffs and their vendors from 1867, and limitation is to be computed in his favor from that time, and not from 1892, when the water power was diminished by some unknown cause.

"Fifth. Plaintiff's cause of action, if he ever had any, is barred by the statutes of limitation of ten years.

"Sixth. Defendant has acquired a title by prescription to the use of the water as it exists, by reason of his long use and possession for more than twenty years."

*Opinion.*—We believe the lower court properly disposed of the case, and that appellant was not entitled to recover against defendant. As to the prescriptive rights of defendant see Baker v. Brown, 55 Texas, 377; Rhodes v. Whitehead, 27 Texas, 316; Haas v. Choussard, 17 Texas, 588. The judgment of the lower court is affirmed.

*Affirmed.*

Writ of error refused.